Egan Inc. v. Commissioner.
Egan, Inc. v. Commissioner
Docket No. 46555.
United States Tax Court
T.C. Memo 1955-117; 1955 Tax Ct. Memo LEXIS 222; 14 T.C.M. (CCH) 421; T.C.M. (RIA) 55117; May 9, 1955
Joseph A. Maun, Esq., Hamm Building, St. Paul, Minn., and William R. Busch, Esq., for the petitioner. Thomas A. Steele, Jr., Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in income tax and adidtions to tax against the petitioner, Egan Inc., as follows: Addition to
Deficiency in
Tax section
Year
Income Tax
293(b)
1946
$ 4,531.50
$2,265.75
1947
5,020.85
2,510.43
1948
74,822.41
It has been stipulated by the parties that the Court may enter its decision in favor of respondent for the years 1946 and 1947 in the *223 amount of deficiencies and additions to tax enumerated above for those years. There remains for our consideration the sole issue of whether the Commissioner erred in his determination of a deficiency for the year 1948 in holding that petitioner was availed of in that taxable year for the purpose of preventing the imposition of the surtax upon its sole shareholder, Henry G. Egan, by permitting earnings or profits to accumulate in lieu of a division or distribution thereof to its shareholder within the meaning of section 102, Internal Revenue Code of 1939. Findings of Fact Some of the facts have been stipulated and such facts are accordingly so found. Petitioner is a Minnesota corporation and during the years here involved maintained its principal office at 222 North Concord Street, South St. Paul, Minnesota. It kept its books and filed its income tax returns on the basis of a calendar year and upon the accrual method of accounting. The returns for the period here involved were filed with the collector of internal revenue for the district of Minnesota. Egan Inc. is the present name of petitioner. As incorporated, its name was Egan Chevrolet, Inc., the change having been effected *224 by amendment to its charter on December 31, 1948. Petitioner was incorporated December 14, 1932, with an authorized capital stock of $50,000 represented by 500 shares of par value stock at $100 per share. Only 100 shares of such stock were issued and were held as follows: Number of Shares
Held on
December
December
Stockholder
Title
14, 1932
31, 1948
Henry G. Egan
President and General Manager
98
100
Alice M. Egan (Wife
Secretary-Treasurer
1
0
of Henry G. Egan)
Alois J. Pieper
Vice-President (1932), Secre-
tary (1948)
1
0
Total
100
100
Henry G. Egan, hereinafter referred to as Egan, died on January 15, 1953. Before his death, and by the close of 1948, he had acquired all of the outstanding stock of petitioner. During all of the time material to this case he was a resident of South St. Paul, Minnesota, and his individual income tax returns for such time were filed with the collector for the district of Minnesota. In 1927 he personally obtained an exclusive franchise from the Chevrolet Division of General Motors Corporation to sell Chevrolet automobiles and trucks in the city of South St. Paul, Minnesota. The term of *225 the franchise was one year from November 1, 1927 to October 31 of the ensuing year, at which date termination occurred without the necessity of any act of termination on the part of either contracting party. However, the franchise was renewed each year by General Motors while held by Egan and petitioner until October 31, 1948, when it was finally terminated by the refusal of General Motors to renew the same. On January 3, 1933, Egan conveyed his interest in the franchise agreement to Egan Chevrolet, Inc., hereinafter referred to as Egan Inc. or petitioner, in exchange for 100 shares of fully paid capital stock of that corporation. In the same transaction Egan also conveyed to Egan Inc. his Chevrolet agency in South St. Paul. At that date the board of directors of the corporation fixed the fair market value of the franchise and the agency property at $26,680. Petitioner subsequently conducted the Chevrolet sales agency under annual renewals of the franchise without interruption until October 31, 1948. Among other requirements, the franchise imposed upon petitioner the duty to maintain a new car sales agency, including a service station, parts and accessories and used car facilities, *226 all of which were required to be conducted and maintained in a manner satisfactory to General Motors. Petitioner might not change its business location without General Motors' consent. At the termination of the franchise petitioner was bound by its terms to discontinue the use of the word "Chevrolet" in its name. Prior to 1941 petitioner purchased new cars from the manufacturer for retail sale from its cash. However, its outstanding liability from 1933 through 1946 upon note indebtedness was as follows: At Year End
Notes Payable
Highest
Other Than
Owed to
Liability
to Officers
Officers
Total
During Year
1933
$ 13,000.00 - February
1934
$ 15,406.16
$ 15,406.16
15,406.16 - May thru Dec.
1935
10,000.00
10,000.00
25,406.16 - July and Aug.
1936
15,840.34 - Feb. thru Sept.
1937
15,000.00
15,000.00
15,000.00 - December
1938
5,000.00
$ 63,672.03
68,672.03
68,672.03 - December
1939
10,000.00
63,284.92
73,284.92
84,002.52 - February
1940
40,000.00
59,940.07
99,940.07
99,940.07 - December
1941
117,019.92
74,384.64
191,404.56
191,404.56 - December
1942
9,500.34
110,459.80
119,960.14
305,895.78 - March
1943
110,879.35
110,879.35
110,879.35 - December
1944
87,421.49
87,421.49
110,489.76 - January
1945
670.58
86,750.91
87,421.49
87,421.49 - Jan.-Dec.,
1946
87,421.49 - Jan.-Nov.
1947
1948
*227 A substantial portion of sales were upon the installment basis. Such sales were evidenced by contracts which were in nearly all instances subsequent to 1946 assigned to either General Motors Acceptance Corporation, hereinafter referred to as G.M.A.C., or the Stockyards National Bank of South St. Paul. Upon such assignments of sales contracts, petitioner received from the assignee the full amount of the sales price for each automobile so sold less any down payment made. Full payment upon all assigned contracts was personally guaranteed by Egan and endorsed with recourse by Egan Inc. Neither petitioner nor Egan ever sustained a loss from such transactions. The year-end total amounts of sales contracts assigned by petitioner for the indicated years were as follows: Year
Amount
1946
$ 66,336.11
1947
137,235.35
1948
162,628.90 The approximate average of monthly outstanding balances due on such sales contracts assigned to G.M.A.C. from December 1947 to December 1948, inclusive, was $100,162, and the approximate monthly balances due on contracts assigned to the Stockyards National Bank for the period August 1947 through December 1948 was $2,861.50. On the G.M.A.C. *228 books an account was kept wherein a percentage of interest paid upon such contracts by the purchasers was credited and eventually paid to petitioner as follows: Date
Amount
January, 1948
$ 215.27
March, 1948
580.78
May, 1948
605.57
July, 1948
695.69
September, 1948
320.16
February 10, 1950
4,000.00
September 6, 1950
469.14
Normally the business of selling new cars is highly competitive, but the years 1946, 1947 and 1948 were abnormal in this respect in that being the years immediately following World War II they were characterized by what is known as a "seller's market." The public demand for new cars during that period far exceeded the manufacturers' ability to produce, with the consequence that automobiles in the sense of inventory were not available to petitioner. It sold all it could obtain. In 1946 petitioner was requested by General Motors to build a larger garage and generally expand its business facilities in order to retain its Chevrolet franchise. To that end, petitioner on December 31, 1946, set aside and earmarked the sum of $85,000. However, this fund was never used for that purpose. It was on December 9, 1949, transferred to petitioner's *229 "investment account" with the Northwestern National Bank of Minneapolis. Following the request of General Motors, petitioner on November 19, 1947, began the construction of a one-story and basement garage building in South St. Paul. The new building was designed primarily for truck sales and services. On September 8, 1948, further construction was halted, and as a result the building was never used actively in petitioner's business. By the latter date, petitioner had expended the sum of $114,312.66 upon the construction of the building Jaeson H. Kline, who was petitioner's successor in ownership, completed the building for use in the operation of a Chevrolet sales agency at an additional cost of $105,840.42. Petitioner's gross sales, accrued Federal income tax, return income after Federal income tax, and surplus for the years 1945 through 1948 were as follows: Surplus per books
adjusted to reflect
accrual of Federal
Return in-
income taxes per
Accrued Federal
come after
Federal income
Year
Gross sales
income tax
Federal tax
tax returns
1945
$ 357,815.03
$ 7,311.57
$ 18,585.13
$169,477.38
1946
899,521.74
75,137.40
122,592.61
303,774.35
1947
1,508,242.77
152,310.87
249,227.73
560,371.44
1948
1,613,395.48
136,393.37
222,915.35
626,876.19 *
*230 With the exception of the stock dividend paid in 1948 as mentioned above, the only dividend paid by petitioner from the time of its inception until its liquidation in 1953 was a cash dividend of $10,000 paid in 1936 to Henry G. Egan. The balance sheets of petitioner attached to its Federal income tax returns for the years 1945 to 1948, inclusive, are as follows: ASSETS
1945
1946
1947
1948
Cash and Contracts in
$ 97,641.55
$179,439.25
$448,783.91
$ 474,567.13
Transit
Accounts Receivable
5,209.44
15,800.37
10,104.50
14,634.79
Inventories
66,068.27
105,685.79
128,400.05
96,862.41
Prepaid Expense
1,704.14
2,089.54
3,978.95
3,118.65
Fixed Assets
84,027.03
86,036.38
92,417.60
219,090.50
Repossession Reserve
577.93
1,291.07
3,510.05
4,424.55
Advances to employees
300.21
24.13
19.14
and others
Land
20,000.00
20,000.00
51,240.00
55,504.05
Discounts Receivable
700.00
5,617.50
8,715.00
7,735.00
Due from affiliated
company
Securities
54,549.84
20,538.00
38,000.00
Accounts Payable,
3,360.58
470.94
450.00
106.25
Debtor Balance
Officers' Accounts
12,460.46
12,839.87
Loans - non-auto
125,000.00
TOTALS
$334,138.99
$449,453.43
$798,459.07
$1,001,093.33
LIABILITIES
Accounts Payable
$ 8,554.09
$ 16,040.32
$ 18,806.63
$ 5,545.56
Acc'ts Receivable -
17,903.32
9,328.83
15,564.96
11,984.89
Credit Balances
Due Officers
Notes Payable -
86,750.91
Officers
Service Contract Dep.
2,342.00
302.25
947.50
657.50
Notes Payable
Accrued Interest
Accrued Expense
Accrued Payroll
177.35
596.92
1,126.58
11,122.27
Accrued Commissions
67.00
113.66
212.32
113.82
Accrued Insurance
704.18
1,067.54
1,271.67
1,548.82
Accrued Taxes
4,553.17
5,089.37
6,350.99
10,780.87
Reserve for Bad Debts
254.53
186.03
502.87
126.14
Reserve for
20,433.55
22,971.22
24,360.81
32,158.36
Depreciation
Reserve for Used Cars
Withholding Tax Payable
4,939.36
4,845.54
6,632.43
3,785.54
Due Others
670.58
Income Tax Accrued
151,729.21 *
Capital Stock
10,000.00
10,000.00
10,000.00
160,000.00
Surplus
176,788.95
378,911.75
712,682.31
611,540.35 **
TOTALS
$334,138.99
$449,453.43
$798,450.07
$1,001,093.33
*231 Petitioner's gross sales, accrued Federal income tax, return income after Federal income tax, and surplus for the years 1949 to the date of its liquidation on March 18, 1953, were as follows: Surplus per books
adjusted to reflect
accrual of Federal
Income per Return
income taxes per
Accrued Federal
after Federal
Federal income
Year
Gross Sales
Income Tax
Income Tax
tax return
1949
$146,193.78
$3,804.41
$13,171.31
$626,277.69
1950
19,524.69
(2,346.71)
625,179.53
1951
27,832.98
6,344.96
629,902.05
1952
35,659.91
974.17
305.53
626,829.07
3-18-53
4,695.27
132.72
2,829.02
630,331.09
The balance sheets of Egan Inc. for the years 1949, 1950, 1951, 1952, and for the period ending March 18, 1953, per books, and adjusted to reflect Federal income taxes, are as follows: EGAN INC.
So. St. Paul, Minn.
As at 3-18-53
Assets
1949
1950
1951
1952
(dissolution)
Cash
$339,587.15
$ 9,706.98
$ 384.05
$ 6,073.54
Notes
23,804.28
19,500.00
18,020.00
16,508.81
$ 16,114.28
Receivable
Inventories
1,855.00
Furniture and
500.00
500.00
500.00
500.00
500.00
Fixtures
1948 Chevrolet
695.00
695.00
Pickup
Finance Company
4,423.35
Reserve
Due from
18,691.65
16,278.48
8,301.38
21,103.25
21,103.25
Officers
Securities
85,000.00
Loan -
165,000.00
130,114.26
130,114.26
109,925.21
109,925.21
Riverview
Kline Mortgage
157,699.99
N. W. Nat'l
614,839.33
611,095.85
610,307.13
615,459.77
Bank,
Investment Acc.
Bonds
26,618.28
34,118.28
34,118.28
Total
$796,561.42
$791,634.05
$795,728.82
$798,536.22
$797,220.79
Liabilities
Accounts
$ 108.55
$ 108.55
$ 108.55
$ 583.55
$ 1,052.72
Payable
Accounts
3,172.40
2,544.65
2,455.19
2,455.19
Receivable -
Cr. Balance
Withheld Taxes
4,266.67
Accrued Taxes
3,173.57
3,173.57
3,173.57
3,377.57
3,188.57
Reserve for
50.00
60.50
Depreciation
Federal Income
3,804.41
974.17
132.72
Taxes Payable
Capital Stock
160,000.00
160,000.00
160,000.00
160,000.00
160,000.00
Surplus
626,277.69
625,179.53
629,902.05
626,829.07
630,331.09
$796,561.42
$791,634.05
$795,728.82
$798,536.22
$797,220.79
*232 The advisability of declaring a dividend was discussed by petitioner's board of directors on December 31, 1947. Because petitioner had committed itself to an $85,000 building program with an assumed additional cost of $40,000 and the proposed necessary expenditure of $25,000 for furniture, fixtures and equipment, plus petitioner's contingent liability to G.M.A.C. on the unpaid balances of assigned sales contracts which were endorsed with recourse, it was determined not to declare a dividend. At that time the unpaid balance due on such sales contracts was $81,800. The new and used car and truck sales volume of petitioner for the years shown below were as follows: 1939
1940
1941
New Cars and Trucks
Units Sold
530
616
703
Sales
$452,023.02
$546,036.38
$ 670,162.59
Cost of Sales
$335,033.28
$405,017.81
$ 485,748.15
Gross Profit
$116,989.74
$141,018.57
$ 184,414.44
Used Cars and Trucks
Units Sold
1087
1158
1327
Sales
$282,948.44
$309,738.33
$ 407,234.18
Cost of Sales
$305,281.37
$349,214.68
$ 440,331.35
Gross Profit
[22,332.93)
[39,476.35)
$ (33,097.17)
Total Cars and Trucks
Units Sold
1617
1774
2030
Sales
$734,971.46
$855,774.71
$1,077,396.77
Cost of Sales
$640,314.65
$754,232.49
$ 926,079.50
Gross Profit
$ 94,656.81
$101,542.22
$ 151,317.27
New Cars and Trucks
Units Sold
530
616
703
Cost of Sales
$335,033.28
$405,017.81
$ 485,748.15
Average Cost
$ 632.14
$ 657.50
$ 690.96
Used Cars and Trucks
Units Sold
1087
1158
1327
Cost of Sales
$305,281.37
$349,214.68
$ 440,331.35
Average cost
$ 280.85
$ 301.57
$ 331.82
Total Cars and Trucks
Units Sold
1617
1774
2030
Cost of Sales
$640,314.65
$754,232.49
$ 926,079.50
Average Cost
$ 395.99
$ 425.16
$ 456.20
*233 1947
1948
New Cars and Trucks
Units Sold
500
460
Sales
$ 834,087.50
$ 834,096.76
Cost of Sales
$ 586,975.31
$ 560,654.95
Gross Profit
$ 247,112.19
$ 273,441.81
Used Cars and Trucks
Units Sold
413
542
Sales
$ 473,087.44
$ 578,772.54
Cost of Sales
$ 218,248.24
$ 340,984.76
Gross Profit
$ 254,839.20
$ 237,787.78
Total Cars and Trucks
Units Sold
913
1002
Sales
$1,307,174.94
$1,412.869.30
Cost of Sales
$ 805,223.55
$ 901,639.71
Gross Profit
$ 501,951.39
$ 511,229.59
New Cars and Trucks
Units Sold
500
460
Cost of Sales
$ 586,975.31
$ 560,654.95
Average Cost
$ 1,173.95
$ 1,218.82
Used Cars and Trucks
Units Sold
413
542
Cost of Sales
$ 218,248.24
$ 340,984.76
Average cost
$ 528.45
$ 629.12
Total Cars and Trucks
Units Sold
913
1002
Cost of Sales
$ 805,223.55
$ 901,639.71
Average Cost
$ 881.95
$ 899.84 The average cost to petitioner for each new car and the number sold per year was as follows: Year
Average Cost
Units Sold
1939
$ 629.38
410
1940
663.22
445
1941
710.20
954
1947
1,623.61
274
1948
1,312.71
350
The financing of its own conditional sales contracts would *234 have been a profitable and desirable business as an adjunct for or phase of petitioner's automobile sales agency. Its immediate successor to the agency and the Chevrolet franchise, Jaeson H. Kline, in examining petitioner's records preparatory to purchasing its physical assets, and with the object in mind of operating his own car sales finance business in connection therewith, believed the amount of required capital for so doing would be $190,000 in 1948. Kline was a man of long experience in the business of operating automobile sales agencies. Egan, his son as an employee of petitioner, and petitioner's treasurer had at various times during the years here involved discussed informally the carrying on by petitioner of such a finance business. Some investigatory steps were taken from time to time by one or the other of them to that end. At no time however did petition actually embark upon such a project or take any formal action looking thereto. Beginning in late 1947 Chevrolet Motor Division of General Motors Corporation instituted an intensive investigation of complaints of customers of petitioner with respect to selling practices which, if true, were in violation of the franchise *235 agreement. Egan was aware of the investigation which extended over a period of 7 months. From May 27, 1948, until July 10, 1948, the petitioner did not receive any shipment of new cars. Subsequent to July 10, 1948, and until October 31, 1948, petitioner continued to receive shipments of new cars. On July 23, 1948, petitioner was notified in writing by General Motors that its franchise agreement would not be renewed at the expiration of its term on October 31, 1948, and that its authorized dealership would thereupon be canceled. Egan made repeated efforts to have the franchise renewed but after a full hearing was finally notified orally by the president of General Motors that the contract would not be renewed. Such proved to be the case, for petitioner at no time subsequent to October 31, 1948, ever possessed or operated under an automobile sales franchise agreement with a division of General Motors Corporation or, indeed, with any car manufacturer. At a conference with representatives of Chevrolet Motor Division held on October 27, 1948, Egan agreed to discuss the disposition of petitioner's assets with applicants for the franchise in South St. Paul. Egan, a man of determination *236 and "drive" in prior years, was still hopeful of somehow regaining the Chevrolet franchise for petitioner, of obtaining the franchise of another automobile manufacturer, or of petitioner's entry into the real estate business. With these aspirations in mind, he effected an amendment to petitioner's charter on December 31, 1948, as hereinabove mentioned. The amended charter authorized the conduct by petitioner of a real estate business and deleted the word "Chevrolet" from its corporate name. The amendment further provided for an authorized capital stock increase from $50,000 par value to $200,000. As of the same date, petitioner paid a stock dividend of $150,000 (1,500 shares) par value, all of which was issued to Henry G. Egan, increasing the corporation's outstanding stock to 1,600 shares with a par value of $160,000, all of which was owned by Egan. Petitioner at that time owned the agency building then in use and the partially constructed building before referred to. It was in an advantageous position to purchase two apartment buildings recently constructed by Riverview, Inc., a corporation in which Egan held a controlling stock interest and which is more particularly referred to *237 hereinafter. At a meeting of the board of directors of petitioner held December 30, 1948, the primary issue discussed was whether or not dividends should be declared since petitioner's surplus would be, in view of the board, approximately $750,000 at the close of that year. In resolving not to declare a dividend, the following factors were considered and noted on the minutes: That it did not appear the Chevrolet franchise would be renewed, that a new business enterprise would have to be undertaken, that the most feasible field for a new enterprise would be real estate, and that the estimated capital for entering that field would involve an approximate figure of from $300,000 to $500,000. Egan by letter dated January 13, 1949, in bringing to the attention of the general sales manager of Chevrolet the financial difficulties involved in attempting to continue the operations of petitioner's business without a sales franchise pending a sale of its assets, opened his communication with an appeal for the renewal of the sales franchise for the year 1949. Again on January 19, 1949, by telegram he made a further appeal to the general sales manager for renewal of the franchise, and shortly *238 prior to August 29, 1949, he requested the granting of a franchise by Chevrolet to be exercised anywhere in the United States other than South St. Paul. All the requests were refused. Egan talked with the representative of Hudson Motor Company relative to the possibility of obtaining its sales franchise. Nothing of substance resulted therefrom. On March 9, 1949, petitioner's two buildings, its agency and equipment were sold to Jaeson H. Kline. The net working capital of petitioner for the years 1945 through 1948 was as follows: Current
Current
Net Working
Year
Assets
Liabilities
Capital
1945
$227,575.36
$126,661.96
$100,913.40
1946
339,850.41
37,384.43
302,465.98
1947
646,809.60
50,913.08
595,896.52
1948
718,829.44
197,268.48
521,560.96
On March 18, 1953, subsequent to the death of Egan, petitioner was completely liquidated and all of its assets distributed to the executor of Egan's estate. On June 10, 1948, petitioner loaned the sum of $100,000 to Riverview, Inc., and on November 24, 1948, an additional $25,000 for beginning the construction of two apartment buildings. The loans were made for one year and thereafter were callable *239 on demand. The former loan was made during the period of temporary lapse in the shipment of new cars to petitioner. Riverview Chevrolet, Inc., was organized under the laws of Minnesota on September 19, 1934, with an authorized capital stock of $50,000 consisting of 500 shares of common stock having par value of $100 per share. One hundred shares of stock were issued at the inception of Reverview Chevrolet, Inc. At that time Egan acquired 98 shares, his wife (Alice M. Egan) acquired one share, and his accountant (Alois J. Pieper) acquired one share. On the death of Alice M. Egan in August 1936, her one share was reissued to Mrs. Frances Egan (Egan's mother) as of September 1, 1936. On December 30, 1936, 150 additional shares of stock were issued to Egan for $15,000. On December 22, 1941, and upon the death of his mother (Mrs. Frances Egan), he acquired the share of stock owned by her. On December 22, 1941, Riverview Chevrolet, Inc., was rendered inactive and its assets were sold to Egan Chevrolet, Inc. All stock, except one share owned by Alois J. Pieper, was purchased by the corporation (Riverview Chevrolet, Inc.) and retired. In order that said corporation would have a stated *240 capital of $1,000, Egan loaned the corporation $1,000 on a noninterest bearing note. On April 15, 1948, it was decided to reactivate Riverview Chevrolet, Inc. On April 16, 1948, its articles of incorporation were amended so as to change its name to Riverview, Inc., and to enlarge and change its powers. Egan subscribed to 175 shares of the stock of Riverview, Inc., paying $16,500 therefor and at the same time cancelling its note to him for $1,000. At the same time Egan's second wife, Carol Egan, his daughter, Marcella Egan, and his son, Henry G. Egan, Jr., each were issued 25 shares, all of which were fully paid for. The 250 shares thus issued constituted the sole outstanding stock of Riverview, Inc., and continued to be held as above until Egan's death in 1953. Pieper acquired no stock in Riverview, Inc. Egan's death was caused in 1953 by a brain tumor. Although unaware of the cause, he began to experience symptoms at least as early as July 1947 when he complained of numbness in his right hand and arm. From that date his symptoms progressively worsened. His facial muscles became somewhat affected in 1947. In 1948 Egan evidenced personality changes which took the form of a lessening *241 of his accustomed "drive. " Characteristic of the effects of his illness was the retention of the ability to think analytically but an indifference regarding mental problems. Although Egan was unaware of the cause of his illness during 1947 and 1948, he was greatly perturbed because of its progressive nature and felt the need to arrange his personal estate. To that end, in March 1949 he consulted with an officer of the Northwestern Bank at Minneapolis. The petitioner was availed of during 1948 for the purpose of preventing the imposition of the surtax upon its sole shareholder, Egan, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed. Opinion The only issue is whether petitioner was availed of in 1948 for the purpose of preventing the imposition of surtax upon its sole stockholder, Henry G. Egan, by permitting its earnings or profits to accumulate during that year beyond its reasonable requirements. The question is one of fact to be determined from all the evidence. Lion Clothing Co., 8 T.C. 1181. Section 102, Internal Revenue Code of 1939, the applicable statute, is set forth in the margin. [1]
*242 In support of his determination of the deficiency the respondent contends that as of the close of 1948 petitioner had lost its automobile sales franchise agreement with Chevrolet Motor Division of General Motors Corporation, which was the basis of its existence, and therefore had no business need for its accumulated earnings or profits, and that such earnings and profits were retained in order to prevent the imposition of surtax upon Egan, petitioner's sole shareholder. He does not contend that petitioner was a holding or investment corporation. Petitioner adopts the position that as of the close of 1948 it was faced with the necessity of providing the necessary capital to launch itself upon a new automobile sales enterprise elsewhere than South St. Paul, or in the real estate business, or in some other field of endeavor; that should it succeed in remaining in the automobile business its accumulated earnings or profits would be required to acquire an inventory of new cars, repair equipment and parts, and the financing of its own installment sales. Should it enter the real estate field, such accumulation would, it is claimed, be necessary in the acquisition of certain apartment *243 buildings and other real property. After careful consideration of the entire record we are unable to agree with petitioner. It is plainly apparent that on the date of termination of its Chevrolet sales franchise on October 31, 1948, and because thereof, it had been dealt its death blow from which it was at no time considered it would recover. It therefore at that time had no reasonable business needs, either present or prospective, for its rather substantial surplus. As a practical matter, it is true that because Egan was, and always had been, not only the controlling or sole stockholder but the heart and driving force of petitioner we must consider the expenses surrounding and affecting him individually as having had identical effect upon his corporation, the petitioner. There is no doubt that Egan was aware of the danger of the loss of the Chevrolet franchise at least by July of 1948. He became certain of its loss when the termination date arrived, without any reasonable basis for belief that General Motors would reconsider its decision not to renew. Although Egan made repeated attempts thereafter, and as late as the late spring or summer of 1949, to regain a franchise from General *244 Motors, we are convinced such attempts were made on the basis of mere hope and not because of any real expectation of success. He had before the close of 1948 assumed the aspect of one who would no longer operate as a car dealer. He had agreed to discuss the sale of petitioner's agency, realty and physical equipment to his successor to the franchise and did effectuate the sale thereof shortly subsequent to the close of 1948. As of October 31, 1948, when his franchise was terminated, it is clear that although he retained the vestiges of his former forceful personality he was nevertheless exceedingly worried with respect to his health, particularly because of the progressive symptoms he had been experiencing beginning as early as 1947. We think the record fairly demonstrates that his refusal to entirely surrender to the reality of the loss of the Chevrolet franchise was indicative not of a real possibility of its reinstatement or recovery by petitioner but indicative rather of what remained of his former character. We are supported in this also by the fact that the only objective formal action taken by petitioner looking toward the acquisition of a new business was the amendment of its *245 charter on December 30, 1948, two months subsequent to the final termination of the franchise agreement. The amendment was inconsistent with prospective continuance of business as a Chevrolet car dealer. On the other hand, it was consistent with a possible entry into the real estate field. Obviously, during the closing months of 1948 Egan was but exploring the possibilities of petitioner's continuance in some sort of business but had no real present intention that it should do so. Having so concluded, it is unnecessary that we examine the reasonableness of petitioner's surplus from the standpoint of inventory, financing of installment car sales, the completion and equipping of the new garage building, or the expense of maintaining an automobile sales agency generally. We are left, therefore, with the query: Did petitioner have a reasonable need for its surplus because of its other business aims and purposes? Petitioner has failed to show any concrete basis for a finding that at December 31, 1948, it had business prospects other than the winding up of the car business it had been conducting. It is a fair deduction from the record that if new business was anticipated it was the intention *246 of Egan to conduct it through Riverview, Inc., another corporation in which Egan held a controlling interest, and which was as wholly owned by him and members of his family. Otherwise no reasonable explanation is apparent for petitioner's loans totaling $125,000 to that corporation in 1948, particularly in view of the fact that at the end of both 1947 and 1948 petitioner's board of directors had refused to declare a dividend because of petitioner's own business needs, present and prospective. In any event, it is worthy of note that, even though petitioner were to enter a new business field subsequent to 1948, payment of its accumulated earnings or profits by way of a dividend to Egan as sole stockholder was not tantamount to a loss of such funds to petitioner for the capitalization of such future business prospects. The cases relied on by petitioner have been carefully examined but none of them are sufficiently close to this case on their facts to be in any way controlling. Decision will be entered for the respondent. Footnotes
*. Reflects issuance of stock dividend of $150,000.00 charged to surplus and credited to capital stock issued. Reflects accrued Federal income tax per return of $136,393.37 in lieu of $151,729.21 shown on books for 1948 Federal income tax, additional 1943 and 1944 Federal income tax and 1948 Minnesota income tax.↩
*. Balance sheets do not reflect accrued Federal income and excess profits taxes, except for the year 1948. ↩
**. Surplus for 1948 is reduced by and reflects issuance of stock dividend of $150,000.00 to Henry G. Egan.↩
1. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected, and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: 27 1/2 per centum of the amount of the undistributed section 102 net income not in excess of $100,000, plus 38 1/2 per centum of the undistributed section 102 net income in excess of $100,000. * * *
(c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary. * * *↩